Matthew **PRITCHETT**, Petitioner–Appellee, Cross–Appellant,

v.

Terry **PITCHER**, Respondent–Appellant,Cross–Appellee.

Nos. 96–1098, 96–1107.

United States Court of Appeals, Sixth Circuit.

Argued March 17, 1997.

Decided June 27, 1997.

Andrew N. Wise (argued and briefed), Federal Public Defenders Office, Detroit, Michigan, Matthew Pritchett, Jackson, MI, pro se for Petitioner–Appellee, Cross–Appellant.

Arthur E. D'Hondt (argued and briefed), Lamont M. Walton, Office of the Attorney General, Habeas Corpus Division, Lansing, Michigan, for Respondent–Appellant, Cross–Appellee.

Before: MERRITT and BOGGS, Circuit Judges; BECKWITH, District Judge.[*]

## OPINION

BECKWITH, District Judge.

These cross-appeals arise from the December 15, 1995, decision of the district court granting Petitioner's habeas corpus petition on his claim of prosecutorial misconduct and denying the petition on Petitioner's claim that his confession was involuntary in violation of his right to counsel. We conclude that the district court erred in granting the petition on the basis of prosecutorial misconduct. Accordingly, we reverse, in part.

## I.

Petitioner was charged with the murder of Melvin Grey and with a felony firearm count. On June 8, 1988, Petitioner surrendered himself to the Detroit Police. He was held overnight at Police headquarters. The following morning, Officer John Magnum, a homicide investigator, interrogated Petitioner. The trial court conducted a hearing prior to trial, under the doctrine of *People v. Walker*, 374 Mich. 331, 132 N.W.2d 87 (1965), to determine the admissibility of statements made by Petitioner. At that hearing, Petitioner and Officer Magnum offered conflicting versions of what occurred during the interrogation. Petitioner testified that he said he needed an attorney. Officer Magnum testified that Petitioner asked if he needed an attorney and that no substantive questioning took place thereafter. Officer Magnum further testified that he made no threats or promises to Petitioner to induce him to make an inculpatory statement. The trial court admitted Petitioner's statement indicating that he had fired a shotgun intending to scare Lonnie Smith.

At trial, Lillie Billington testified that, on March 29, 1988, at approximately 9:00 p.m., she heard a loud noise, went to her window, and saw a man lying on the grass across the street from her Detroit home. She called the police.

Emandulay Butler testified that he was a friend of Petitioner. On March 29, 1988, he was at Petitioner's house with Petitioner, Petitioner's mother, and Reggie Pitts. They entered a bedroom to check on a man named Jeff, Petitioner's mother's boyfriend, who had been beaten. At that time, Kenneth Green entered Petitioner's home and wanted to buy marijuana. Green, Butler, Pitts, and Petitioner went out to purchase marijuana. Only Petitioner and Pitts entered the house where marijuana was being sold. Butler and

---

[*] The Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio, sitting by designation.

Green waited outside for Petitioner and Pitts to return. Pitts subsequently joined them, but Petitioner remained in the house. A short time later, they heard a shot and the three men ran back to Petitioner's house. Petitioner returned home a few minutes later. Butler asked Petitioner if he had heard the shot. Butler testified that Petitioner responded: "That was me shooting. I think I hit him. I tried to blow that nigger's back off."

Pitts testified that he was a friend of Petitioner. He echoed Butler's version of events. Pitts testified that while he was in the marijuana house with Petitioner he heard a man named Cook tell someone to go get Lonnie Smith. Pitts then purchased two marijuana joints for Green. Pitts took the joints and Green's change outside. Pitts saw Cook come out of the house and around the side. Cook told Pitts that Smith was one of "the guys who were responsible for Jeff's beating." Pitts heard a shot and ran off with Green. Later, Petitioner was asked whether he heard the shot. Pitts testified that Petitioner responded, "I shot and I think I shot the guy."

Linder Donnell Winbush testified that, on March 29, 1988, she had her husband's pump shotgun at her home, one block north of the site of the shooting. Petitioner was at her home with Pitts. She testified that Pitts came to her house to find out who had beaten Jeff. Pitts told her he believed Lonnie Smith was responsible. She gave Pitts a joint. She testified that the deceased, Melvin Grey, whose photograph she identified, had previously come to her home and was asked by someone on her porch to go get Smith. Grey left, apparently to find Smith. Later, Winbush heard a shot.

Lonnie Smith testified that, on the evening of March 29, 1988, Melvin Grey visited his home and told him that Cook wanted to see him. Smith and Grey walked toward the house where Cook was staying (Winbush's house). Smith saw a man make a suspicious turn and turned around to return to his house. After walking a short distance, Smith heard a shot and began to run.

Kenneth Green testified that he, Petitioner, Pitts, and Butler walked to Linder Don-nell Winbush's house to buy marijuana. Green observed Petitioner enter and exit the house, and then rush to the side of the house. At that time, someone said, "here he comes, yeah, here he comes." Green subsequently heard a loud noise. They all scattered. Later, at Petitioner's home, Green heard Petitioner state that it was "me" in response to a question about the shooting sound.

Warren Cook testified that, on March 29, 1988, at 9:00 p.m., Petitioner and Pitts were at Winbush's house. Pitts asked Cook to summon Smith so Petitioner could beat him. Cook refused. Cook also testified that an alley runs directly behind Winbush's house, and that the alley intersects the street on which Petitioner lived.

On March 29, 1988, at 9:15 p.m., the Detroit police discovered Melvin Grey's dead body in the alley between Winbush's house and Petitioner's house. Dr. Marilee Frazier, an assistant Wayne County medical examiner, testified that the victim, Melvin Grey, died from a shotgun blast of buckshot to his back. The distance between the entry wounds indicated that the shot was fired from a distance of approximately sixty feet.

In closing argument, on the issue of Petitioner's state of mind, the prosecutor argued that the evidence established that Petitioner had the intent to kill Lonnie Smith when he shot and killed Melvin Grey. The prosecutor attempted to explain why Petitioner did not take any further action after firing one shot as follows:

> Why didn't he continue on, why didn't he go after Lonnie? Why did he just drop the one shot? It's clear he intended to kill but why didn't he close in on Lonnie? Consider all the evidence. After that one shot went off everybody's attention was directed and everybody was taking off. He managed to get up on him, he managed to get out here in the street chasing him down Fernhill without drawing anyone's attention. Every witness told us that they weren't directed to anything until they heard gunfire, but once the gunfire was heard they looked and saw that body and they certainly would have seen him carrying that shotgun and chasing down Lonnie

Smith and he's not going to be out there where everyone can see him. He'd save it for some other time; he knew where Lonnie lived, he'd get him some other time.

The prosecutor summarized Petitioner's shooting and killing Melvin Grey:

He got the gun, went out looking for Lonnie, had the signal that Lonnie was coming. Wouldn't even wait for Lonnie to come,—went out looking for him, went out after him, chased him down. [S]hot at him and inadvertently killed Melvin Grey. It was inadvertent in the sense that he shot the wrong man. He intended to kill but he killed the wrong person.

I believe the Court is going to instruct that when a person intends to kill one person and ends up killing another, he is just as liable.

During his closing argument, Petitioner's counsel argued that Petitioner did not intend to kill Lonnie Smith because he did not do so in the months after he shot Grey and before he surrendered. In rebuttal, the prosecutor made the following comment:

The first argument he makes and he makes it very clear over and over again, is that this man, Matthew Pritchett had ample opportunity to kill Lonnie Smith and if he really wanted to kill him back on March 29th Lonnie Smith wouldn't be here. Now, maybe he gives Mr. Pritchett more credit than he deserves. Maybe he knows something about Mr. Pritchett I don't know but I know what one thing; there's been no evidence whatsoever of that ample opportunity that he had after March 29th. We don't know where Lonnie Smith was after March 29th. We don't have any indication that he had ample opportunity to kill him. All we know about Lonnie Smith is that he came in this courtroom under the guard of this officer; that this officer was in the courtroom the whole time Lonnie Smith was here and that Lonnie Smith was walked out of the courtroom by this officer. So, we know that every time we see Lonnie Smith he's been in the custody of an officer,custody protection, I don't know what you want to call it but we don't know and there's been no evidence to indicate that that man had another opportuni-

ty to get him. That's not what this case is all about, it's about the opportunity he had back on March 29th to get him, the opportunity that he used. We can't say he had ample opportunity to get him after March 29th because we don't know where he's been since March 29th; there's been no testimony put forward of that. He could have been in custody since March 29th, we don't know.

Petitioner's trial counsel objected to the implication that Lonnie Smith might have been in protective custody. The trial court ruled as follows:

I don't—he didn't say that he was, he said that he, that there could be any possibility of there might have been reasons of why he didn't have a chance to do anything else to Mr. Smith and I don't think that that is a basis for a mistrial. I don't think it even merits a cautionary instruction to any context in the manner of which it was said.

The court did caution the jury, immediately after the sidebar conference, that what the attorneys say during opening and closing arguments is not evidence. The jury found Petitioner guilty.

Petitioner exhausted available state court remedies and initiated this action. On July 13, 1994, a United States magistrate judge issued a report and recommendation pursuant to which he recommended the denial of Petitioner's habeas petition. The Magistrate Judge made the following recommended conclusion concerning Petitioner's claim based upon his statement to Officer John Magnum:

The United States Supreme Court has now decided that police officers may continue questioning someone who makes what may be an ambiguous request for legal help. *Davis v. United States,* 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).... [R]elief is precluded, as to this ground, by *Davis.*

\* \* \* \* \* \*

[The state court of appeals held that]

Because the accounts of [Pritchett] and Officer Magnum were conflicting, the trial court had to weigh their respective credibility in determining who to believe when deciding whether any promises of

leniency were made to [Pritchett] which he relied upon in making his confession. The trial court apparently believed that [Pritchett's] account of reliance on statements allegedly made by Magnum was not credible, and found that defendant voluntarily spoke with Magnum without being induced to talk by a promise of leniency.

The record supports the trial court's decision. We therefore find no error in the admission of [Pritchett's] statement at trial.

After giving due deference to state court findings of fact (28 U.S.C. § 2254(d), *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)), this Court should conclude that Pritchett's admissions, made during interrogation, were voluntary.

Report and Recommendation, pp. 2–4, 6.

With regard to Petitioner's prosecutorial misconduct claim, the magistrate judge recommended the following conclusion:

This court should conclude that the prosecutor properly argued to the jury that Smith was in custody, because this fact, apparently observed by the jury itself, did tend to rebut, at least in part, Pritchett's lawyer's argument that his client could have killed Smith if he wanted to, even in recent days. However, the prosecutor's injection of the word "protection" might indicate to the jury that the authorities had concluded Smith would only be safe [from attacks by Pritchett] if he, Smith, were placed in police custody. To that extent, the argument does inject a needlessly prejudicial comment into the balance. Be that as it may, I agree that this isolated (one word) misconduct does not satisfy the test for habeas relief. *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982); *Cook v. Bordenkircher,* 602 F.2d 117, 119 (6th Cir.1979), *cert. denied,* 444 U.S. 936, 100 S.Ct. 286, 62 L.Ed.2d 196 (1979); *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1355–56 (6th Cir.1993). In addition, the Court must obey the mandate of the Supreme Court in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), not to grant habeas relief unless it

is persuaded that a constitutional violation had a substantial and injurious effect or influence in determining the jury's verdict. *Id.* at 8.

After appointing counsel for Petitioner, the district court conducted a number of hearings and made numerous remarks at those hearings concerning the prosecutor's integrity in implying that he didn't know where Lonnie Smith was after the murder of Melvin Grey. In its December 15, 1995, Memorandum and Order, the district court adopted the Magistrate Judge's Report and Recommendation as it pertained to Petitioner's statement to Officer Magnum. With regard to Petitioner's second claim, the district court stated that "prosecutorial misconduct so tainted petitioner's trial as to make the result fundamentally unfair in that the jury was denied all of the arguably relevant evidence necessary to an informed judgment." Memorandum and Order, p. 6. The district court further stated as follows:

Premeditation was the critical issue at trial. Petitioner's access to Smith subsequent to the shooting was made a determinative issue in final argument. The prosecutor grossly mischaracterized Smith's "availability" to petitioner. This made the trial unfair, particularly in light of the presiding judge's failure to take specific curative action and in some fashion dispel any inference from the prosecutor's statement—"all we know," etc.—that the jury should conclude Smith was in custody and *that* was why petitioner did not go after him. To shift responsibility to petitioner to explain raises the question of adequacy of representation. In light of the Court's determination this question need not be addressed.

Memorandum and Order, p. 7. The court granted Petitioner's petition for habeas corpus on that ground.

## II.

■ The state court concluded that Petitioner's question to Officer Magnum during interrogation concerning whether he should have counsel was ambiguous and not an unequivocal request for counsel. That court further found that Officer Magnum's testimo-

ny that no threats or promises were made to induce Petitioner's statement was credible. Giving due deference to the state court's finding, *Miller v. Fenton,* 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), the district court rejected Petitioner's claim that his statement was involuntary.

■ Petitioner argues that the district court erred in giving deference to the state court's findings of fact. The version of 28 U.S.C. § 2254(d) in effect at the time Petitioner's case was decided by the district court required the federal courts in habeas corpus proceedings to afford a presumption of correctness to state court determinations of factual issues. The habeas corpus petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. *See Sumner v. Mata,* 449 U.S. 539, 551, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981).

The state court's determination, based upon Officer Magnum's testimony and that court's assessment of the relative credibility of Officer Magnum and Petitioner, is entitled to the presumption of correctness. Petitioner has not identified clear and convincing evidence that would suffice to rebut the presumption that the state court's determination was correct. Accordingly, Petitioner's claim based upon the alleged denial of his right to counsel was properly denied.

### III.

■ The district court granted the petition on the basis of Petitioner's second claim, the claim that prosecutorial misconduct had deprived him of a fair trial. On habeas review, the standard to be applied to claims of prosecutorial misconduct is whether the conduct was "so egregious so as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher,* 602 F.2d 117, 119 (6th Cir.), *cert. denied,* 444 U.S. 936, 100 S.Ct. 286, 62 L.Ed.2d 196 (1979). This court must decide whether the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt. *Angel v. Overberg,* 682 F.2d 605, 608 (6th Cir.1982).

■ In deciding whether prosecutorial misconduct mandates that habeas relief be granted, the Court must apply the harmless error standard. *Eberhardt v. Bordenkircher,* 605 F.2d 275 (6th Cir.1979). The Court must examine "the fairness of the trial, not the culpability of the prosecutor." *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1355 (6th Cir.1993)(quoting *Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 947 (1982)), *cert. denied,* 510 U.S. 1201, 114 S.Ct. 1317, 127 L.Ed.2d 666 (1994).

■ The Sixth Circuit in *Serra* identified factors for consideration in weighing the extent of prosecutorial misconduct:

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Id.* at 1355–56 (quoting *Angel,* 682 F.2d at 608)(internal quotation omitted). In order to constitute the denial of a fair trial, prosecutorial misconduct must be " 'so pronounced and persistent that it permeates the entire atmosphere of the trial,' " *United States v. Thomas,* 728 F.2d 313, 320 (6th Cir.1984)(quoting *United States v. Lichenstein,* 610 F.2d 1272, 1281 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 856 (1980)), or " 'so gross as probably to prejudice the defendant.' " *United States v. Ashworth,* 836 F.2d 260, 267 (6th Cir.1988)(quoting *United States v. Flake,* 746 F.2d 535, 542 (9th Cir.1984), *cert. denied,* 469 U.S. 1225, 105 S.Ct. 1220, 84 L.Ed.2d 360 (1985)).

In this case, the prosecutor's remarks had little potential for misleading the jury. Everything that the prosecutor said was true and was observed by the jury. Petitioner was indeed in custody and that fact was evident to the jury. Moreover, the defense had not presented evidence concerning Petitioner's ability to pursue Lonnie Smith during the time between his surrender and the trial. The jury was aware that no such evidence had been presented.

The prosecutor did not place before the jury any prejudicial and misleading remarks.

Moreover, the competent proof of Petitioner's guilt was abundant. Applying the harmless error standard in this case, we conclude that the prosecutor's statement during closing argument was *not* "so egregious so as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d at 119.

### IV.

For the foregoing reasons, we **REVERSE** the decision granting Petitioner's habeas corpus relief on his claim of prosecutorial misconduct and **AFFIRM** the decision denying the petition on the claim of denial of the right to counsel.